NO. 5812.

J. S. IRVINE v. THE STATE.

1. PRACTICE—EVIDENCE.—It is competent for a witness, in detailing the facts of a transaction, to state the impressions they made upon his mind at the time they occurred, unless such impressions be purely conjectural or too remote. See the opinion for the "impressions" of a witness admitted as evidence *held* under the above rule to be purely conjectural; wherefore the trial court erred in refusing to exclude them.

2. SAME—MURDER.—In a prosecution for murder the State was permitted to prove that the deceased was a cripple, and that he received the gun-

shot wound which crippled him while serving in the Confederate army.
*Held*, that, inasmuch as the purpose of the proof was not to counter-
act damaging testimony affecting the character of the deceased as a
peaceable citizen, it was irrelevant and prejudicial to the defendant
and should not have been admitted.

APPEAL from the District Court of Wise, on change of venue
from Montague. Tried below before the Hon. George A. Mc-
Call.

The indictment in this case was presented in the district
court of Montague county, on the seventh day of October, 1885.
It charged that the appellant did, in Montague county, Texas,
on the second day of July, 1885, willfully and of his malice
aforethought kill and murder one J. W. Kerr by shooting him
with a pistol. At a former trial in Montague county, the pro-
ceedings of which on appeal will be found reported in the twen-
tieth volume of these Reports, beginning on page 12, the ap-
pellant was convicted of murder of the second degree, with the
penalty affixed at a term of five years in the penitentiary. That
conviction having been reversed upon appeal to this court, a
change of venue to Wise county was awarded upon the appli-
cation of the appellant, and this trial was had in the said
county, resulting in a conviction for manslaughter, with the
penalty assessed at a term of five years in the penitentiary.

The testimony adduced upon this trial, except as noted in the
opinion, is substantially the same as that developed upon the
former trial, which will be found fully and circumstantially set
out in the report. (20 Texas Ct. App., 12.) As tending, how-
ever, to more fully illustrate the first ruling of this court on
this appeal, and as sufficient in itself to disclose the immediate
incidents of this transaction, as viewed from the standpoint of
the State, the testimony of the witness Mathews is reproduced
in full, prefaced with a brief statement of other proof to which
the testimony refers, and a reproduction of the plat of the town
of Bowie, in which the homicide occurred. The plat is as fol-
lows:

Statement of the case.

Kerr's Office.

Store.

Bank.

Ward's Saloon.

TARRANT

Well.
O   o Body.   STREET.

Riley's Drug Store.

Lockhart House.

Crawford.

STREET.

Evans's Saloon.

Saddle Shop.

Fight
o
Began.

Central Hotel.

Post Office.

MASON

Cleaver House.

Farmer's Drug Store.

Well.
O

WISE       STREET.

Kerr's House.

It is sufficient for the purposes of this report to state that it was proved on both trials that, seven or eight days prior to the homicide, the deceased and Tom Irvine, the brother of the defendant, had a difficulty in Riley's drug store, in the course of which Tom Irvine threw two vases at the deceased, one of which struck the deceased and broke. On the day before the homicide, a portion of the broken vase was found suspended on the sidewalk wall of Riley's drug store, to which was attached a paper on which was written: "Presented to J. W. Kerr by T. E. Irvine. Please let this hang." It was at least inferentially proved that the said paper was written by Sid Irvine, the defendant. On the day of the difficulty, the deceased attached to the vase, below the said paper, another paper, on which he had written: "Whoever wrote this paper is an infamous puppy. Whoever reads the first, please read the last."

J. H. Mathews testified, for the State, as follows: "I lived in Bowie, Montague county, on July 2, 1885. I know the defendant, Sid Irvine, and his brother Tom, and I also knew J. W. Kerr. I was in Bowie at the time of the difficulty. I was about Riley's drug store a few hours before the shooting occurred and saw the defendant there. I do not know that I heard him say anything about the former difficulty. He called my attention to a piece of paper that somebody had tacked to a piece of a vase, and laughed. The words written on it were: 'Presented to J. W. Kerr by T. E. Irvine.' I thought it was in defendant's handwriting. This was on the day of the shooting, but I can not say how long before the shooting occurred.

"Just before the shooting I was talking with Captain Kerr in front of his office. He remarked to me that he was going to the post office, and he had a letter in his hand. When we got opposite Jarrett's law office, which is in the rear of Riley's drug store, Tom Irvine, the defendant's brother, walked out and asked Kerr if he wrote the note on the vase. Kerr told him that he did. Tom then said: 'I am going to make Sid whip you, or I will do it myself.' Kerr told him to go away, as he wanted to have no difficulty with him. Kerr then walked on, and Tom followed him. As Kerr stepped up in front of Riley's drug store, Tom laid his hand on his shoulder and told him to wait a minute, and asked me if I knew where Sid was, and I told him that I did not. He then called Sid. Kerr then walked off to the front of Evans's saloon, and started across the street towards the post office. Tom then started down the sidewalk,

and Kerr turned around and said: 'Now, Tom, I warn you to let me alone. I don't want any difficulty with you.' Tom then called Sid again, and I looked down the street and saw Sid coming in a fast walk. He walked up to Kerr and handed him a piece of paper, and asked him if he wrote that. Kerr said that he did, and Sid struck him in the face. He staggered back and drew a pistol, but I am satisfied he did not shoot at Sid. Tom drew his pistol, when Kerr presented his pistol at Tom, and, I think, fired. I am not certain whether Kerr or Tom fired first, but I think Kerr did. The shots were very close together. After the first shots were fired I saw Sid with his hand up, and I thought he had a pistol and was firing, but I can not say positively that he did fire. I saw smoke, and the other pistols were between me and him, and I can not say positively what he did have. Sid then ran towards Kerr, but if he hit Kerr I did not see it.

"Kerr then knocked Sid down with his pistol, and then he, Kerr, and Tom fired at each other. Kerr was walking backwards and the Irvines were advancing on him. After Kerr had retreated some distance, Sid picked up a piece of plank and hit him with it. He had retreated nearly to the well. The plank broke when Sid struck with it, and he then grabbed Kerr. This was just as Kerr turned as though he was going to run. Sid threw his arms around Kerr and caught his right hand and held him. The scuffle which ensued—Kerr trying to release himself—brought them nearly to Ward's saloon. While Sid was thus holding Kerr, Tom ran up, put his arms around Sid and shot Kerr. I only heard three words spoken. They were spoken by Kerr just before the last shot was fired and while Sid was holding him. They were: 'Go away, Tom.' Just after the last shot was fired Sid laid Kerr down on the ground. The last I saw of Tom he was running off up the street. Sid walked off; I do not know where he went. I think Kerr was turned about half round when Sid struck him over the head with the board. He did not get completely around before Sid got hold of him. When Sid first struck Kerr, Tom was on the north side of Mason street, to Kerr's right, and Sid was on the left. I think Sid was in his shirt sleeves. Tom had on a coat. Tom was standing in the street when the blow was struck, and I think he had his hands in the waist band of his pants. I saw the shape of a pistol under his vest and pants just before Sid struck Kerr. I saw this before I turned my eyes to Sid, and

just after he struck Kerr I looked at Tom and saw him drawing his pistol. I do not think he had much trouble in getting the pistol out. I had known Kerr since he located in Bowie. He was a heavy built man, but I think was disabled in his left arm. He appeared to have very little use of that arm. He was of about medium height, and about forty-five years old. Tom Irvine would weigh from one hundred and fifty to one hundred and sixty pounds. Sid Irvine looks to be near six feet high, and will weigh about one hundred and forty pounds."

Cross examined: "I think Tarrant street is about eighty feet and Mason street about one hundred feet wide. I think it was somewhere near the center of the street that the difficulty first occurred. It was diagonally across the street from Crawford's store, and between that store and the saloon. From where the killing took place to the upper corner of Riley's drug store, the distance, I suppose, is eighty feet. From the point where the difficulty first began the distance, I suppose, is about sixty-five feet. I think it is about seventy-five feet from the well to where the fight first began. The shooting was very rapid, but I could not tell how long it lasted. I do not know how many shots were fired, but suppose there were ten or twelve. I think Tom and Kerr fired from four to six shots each. I don't know how many shots the defendant fired, nor, as a matter of fact, do I know that he fired any, except as I have testified. He had his hand up, but I could not say positively that he had a pistol in it. I did not see but one of his hands up. I do not remember that I heard Sid halloo 'Hold up! Do not shoot Kerr.' Kerr presented his pistol at Sid first, and then turned and fired at Tom, and I think he shot before Tom did. I saw Tom draw his pistol, at which time Kerr had already drawn his. I saw Sid raise his hand when Kerr presented his pistol. I could not say that I saw smoke arise from the hand that Sid raised up. I could not say who fired the first shot after the first exchange of shots between Kerr and Tom. I do not think that Kerr fired at anybody but Tom. Kerr knocked Sid down after he shot at Tom, and Sid, at the time, was advancing upon him. Sid had one hand raised when he rushed upon Kerr, but I do not think that he had his arms outstretched to prevent Kerr from firing upon Tom. I think his purpose in rushing upon Kerr was to strike him, and I think he had something in his hand to strike with. I think that he, Sid, got so close to Kerr that Kerr could not strike him. I afterward saw the bloody place on Sid's

head which, I suppose, was made by the blow Kerr struck him
The blow which Kerr struck Sid knocked him down, but I do
not think that Kerr shot at him while he was on the ground. I
do not think he fired a single shot at Sid.  I can not say how
closely Sid pressed Kerr while Kerr was backing off.  I saw
nothing in Sid's hand after he was knocked down, and do not
think he had anything in his hand from that time until he seized
the piece of plank. I did not see anything in Kerr's hand while
Sid had hold of him.  I was standing in front of Crawford's
store when the difficulty began, and did not leave that place
until it was over.  I may have moved a little.  Several men
were standing about that store, but I can not now name them.
There was not a large number of people on the streets while
the shooting lasted.  I do not think that everybody ran into
the stores.  I did not turn around.  The bullets were flying up
and down the street, and I may have been a little excited.  I
do not remember what Sid said when he showed me the writ-
ing attached to the vase.  He was laughing at the time; did not
appear to be mad, and spoke in a joking, sarcastic manner.
Sid did not appear to be drunk, and if he had been drinking I
did not know it.  I think Tom was drunk.  I had known Sid
since his location in Bowie, but I can not say how long ago he
located there."

Re-examined.  "I can not say whether it was in the forenoon
or the afternoon that Sid called my attention to the writing on
the paper attached to the vase.  The vase was hung out to pub-
lic view on a public sidewalk."

The brief of the appellant's counsel, which follows, sets out
the bills of exception which bring up the questions discussed in
the opinion.

*H. M. Furman* and *Stephens & Herbert*, for the appellant:
Our first bill of exception reads as follows: " Be it remembered
that upon the trial of the above styled cause the State placed
a witness, J. H. Mathews, upon the stand.  Said witness, while
describing the difficulty in which J. W. Kerr was killed, said:
'I thought that defendant, J. S. Irvine, had a pistol.'  The de-
fendant objected on the ground that this was only an impres-
sion of the witness.  The State's attorney asked the witness as
to his best impression whether defendant had a pistol.  The
witness said: 'It was my best impression that defendant did
have a pistol.'  The State's attorney asked witness what that

impression was based upon. The witness said: 'Upon the way defendant held his hand.' To all of which defendant objected on the ground that it was calling for the opinion of the witness. This objection was overruled by the court; to which defendant excepts." As we regard this ruling as fundamental error, we have copied the bill of exceptions exactly as it appears in the transcript, in order that the court may get the point raised fully and clearly before it. In this connection we will call the attention of the court to the following portion of the evidence of J. H. Mathews as it appears in the transcript:

"After the first shots were fired, I saw Sid with his hand up, and I thought he had a pistol and was firing." This is part of the evidence upon which appellant was convicted and to which we duly objected and excepted at the time it was offered, as is shown by our bill of exceptions. We respectfully submit that this was not legal evidence. We do not regard it as necessary to cite authorities to show that opinion-evidence is only admissible upon questions of skill and judgment. We confidently assert that not a single case can be produced in which a witness has been permitted to swear to his thoughts for facts, or in which he has been permitted to state his impressions and then fortify those impressions by stating the facts upon which they were based. If the point upon which the witness was testifying was one upon which he was an expert, and by skill and judgment was able to form a correct scientific opinion, which the jury could not form and which they could only get from experts, then in such a case the witness might be allowed to give his judgment. As to a plain matter of fact, requiring no skill or judgment to arrive at it, and one upon which the jury are just as competent to think and form impressions and opinions about as the witness is, it is not legal to allow a witness to give his thoughts and impressions as evidence. This evidence was not only illegal, but it was also of a character highly calculated to injure the rights, and in all probability did injure the rights of appellant. It was not claimed by the State that appellant killed J. W. Kerr with his own hands. The State concedes that J. W. Kerr was shot and killed by Thomas Irvine, a brother of appellant. But the State seeks the punishment of appellant upon the ground that appellant was present and aided by acts and encouraged by words, his brother Tom, in taking the life of J. W. Kerr. The strongest evidence that they have that the appellant did aid and encourage his brother,

Tom Irvine, in taking the life of J. W. Kerr, is, "I saw Sid with his hand up, and thought he had a pistol and was firing." We do not object to the statement that the witness saw appellant with his hand up. If the witness had seen anything in appellant's hand, we would not have objected to his saying so, and if he could not have said positively what the appellant did have in his hand, we would not have objected to the witness describing what appellant did have as near as possible. But we invite the attention of the court to the fact that the witness does not pretend that appellant had anything in his hand. The evidence objected to is not what appellant did—nor to what appellant had in his hand—but to what the witness had in his mind, for which appellant is in no wise responsible. We respectfully submit that no man should be convicted unless his conviction is obtained on legal evidence. If the State violates a law in order to obtain a conviction, the courts of our country will soon become a mockery and a reproach. It would be but the assassination of law in the very temples dedicated to its enforcement.

We next invite the attention of the court to our second bill of exceptions, which is as follows:

"Be it remembered that upon the trial of the above entitled cause the State placed Mrs. Kerr upon the witness stand: She testified that she was the wife of the deceased, J. W. Kerr, and that deceased was crippled in his left arm, and had the bone of his elbow taken out. The State then asked the witness to state when and where he received said injury? To this question the defendant objected on the ground that said evidence was immaterial and irrelevant. The court overruled this objection, and the witness answered: 'The deceased received this injury in the Confederate army.' The defendant moved the court to exclude this evidence on the ground that it was immaterial and irrelevant to the issue in this case how said injury was received. The court overruled this objection; to all of which the defendant excepted."

As a matter of common sense as well as justice and law, when a defendant is placed upon trial when his liberty is at stake, he has the right to be tried by legal evidence alone. Section 19 of the Constitution of Texas says: "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Article 3128 of the Revised Statutes of

Texas says: "The common law of England (so far as it is not inconsistent with the Constitution and laws of this State) shall, together with such Constitution and laws, be the rule of decision, and shall continue in force until altered or repealed by the Legislature." Article 2245 says: "The common law of England, as now practiced and understood, shall, in its application to evidence, be followed and practiced by the courts of this State, so far as the same may not be inconsistent with this title or any other law." Thomas Starkie, the great English writer on common law evidence, says that the rules of evidence were established for the purpose of providing "more certain tests of truth than can be provided, or indeed are necessary, in the ordinary course of affairs," and that they exclude all "evidence which, if generally admitted, would be more liable to mislead than to answer the purposes of truth." (1 Starkie on Evidence, 13.) The same author says: "One great object of the law is to aid the natural powers of decision by adding to the weight and cogency of the evidence on which the jury is to act. Another great object is to prevent the reception of evidence which, in its general operation, would injure the cause of truth by its tendency to distract the attention of a jury, or even mislead them." (Volume 1, page 14.) Again on page 15: "Again, for the purposes of saving both time and expense, and to prevent the minds of the jury from being distracted from that which is material, it is indispensably necessary to place bounds to collateral evidence, and to exclude such as is of too weak and suspicious a nature to deserve credit, and which, though it possessed no tendency to mislead, would still be mischievous in occasioning delay and expense, and attracting fruitless attention."

The common law of England, then, is that no evidence is admissible except that which will aid the jury in arriving at the truth of the issue to be tried, and that all evidence which does not bear upon the truth of the issue on trial, or which is calculated to mislead the jury, or that attracts "fruitless attention," should be excluded. Mr. Starkie says that "it is indispensably necessary" to exclude such evidence.

This being the common law of England, and never having been altered by the laws of Texas, it is a part of "the law of the land." If this rule has been disregarded in the case now before the court, then the conviction of appellant is unconsti-

tutional, because he is being deprived of his liberty against "the due course of the law of the land."

We do not object to the statement that J. W. Kerr "was crippled in his left arm, and had the bone of the elbow taken out." This was a part of his physical condition at the time of the difficulty, and was admissible as a part of the res gestæ. But we respectfully ask what possible connection could there be between the fact that he lost the bone of his elbow in the Confederate army and the guilt or innocence of appellant? In what manner possible does the Confederate war reflect light upon this transaction? This evidence, therefore, was clearly immaterial, and it was error to overrule our objection to it on this ground. It is worse than immaterial; it not only fails to illustrate the question upon trial, but it brings foreign matter into the case, of such a character as was highly injurious to the rights of appellant. It was calculated to arouse on the side of the State a feeling for "the hero who so nobly poured out his blood in defense of his country." The court had, by over-ruling our objections, practically told the jury that it was legal evidence to be considered by them as against the appellant. They were warranted in regarding it as evidence. State's counsel, then, had the right to allude to the manner in which J. W. Kerr received the injury to his arm. Thus without warrant or authority of law, and contrary to every principle of the admissibility of evidence, and over our protest and bill of exceptions, a fire brand was thrown into the jury box to inflame their passions and prejudices against appellant. This court judicially knows the feeling that exists in the hearts of our people toward Confederate soldiers. It is known to every man who knows anything about the feelings of our people and the condition of our country. We most earnestly insist that the case should be reversed upon this bill of exceptions. The evidence is clearly inadmissible. We excepted to it at the time. It is calculated to injure, and in all probability did injure appellant. If a ruling of this kind is to be sustained, it should be done in such terms as to let the bar of Texas know that hereafter it will be a waste of time for them to except to evidence on the ground that it is immaterial and irrelevant, and calculated to injure the party upon trial.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This is a second appeal in this case. At the first trial in Montague county, appellant was convicted of murder in the second degree, and his punishment fixed at five years in the penitentiary. (Irvine v. The State, 20 Texas Ct. App., 12.) After the case was reversed on the former appeal by this court the venue was changed to Wise county, and this present appeal is from a judgment of conviction in the latter county, upon a trial wherein defendant was found guilty of manslaughter, with punishment again affixed at five years in the penitentiary.

Defendant objected to a portion of the testimony of the State's witness Mathews, who said: "I thought the defendant, J. S. Irvine, had a pistol," the objection being upon the ground that the witness could not testify as to his impression. The witness said: "It was my best impression that defendant did have a pistol," and upon being asked what that impression was based upon, he said: "Upon the way defendant held his hand."

Discussing the admissibility of such evidence, the learned author, Mr. Wharton, says: "The limitedness both of human observation and human expression forbids the reproduction of any fact exactly; it is enough if a witness swears to events and objects according to his best recollection and belief. But it is no objection to to the admissibility of such evidence that the witness uses the term 'impression' if he testifies to what he believes, however distrustful he may be as to perfect accuracy. It is for the jury to determine how far such 'impressions' are reliable. So a witness is allowed to state why certain facts are impressed on his memory, if such reasons are not for other grounds inadmissible. Impressions, however, which are conjectural and uncertain can not be detailed." (Whart. Crim. Ev. (8 ed.), sec. 462; see also, Powers v. The State, 23 Texas Ct. App., 43.)

We are of opinion the "impression" was entirely conjectural, and too uncertain to be admitted as evidence. The witness does not even state that he saw anything at all in defendant's hand, nor the mode and manner in which defendant held his hand so as to impress him that he did have a pistol.

Another exception was reserved in connection with the testimony of Mrs. Kerr, the wife of deceased. After she had testified that deceased was crippled in his left arm, and that the bone in the elbow of that arm had been taken out, the prosecution asked the witness when and where he had received the in-

jury; to which the defendant objected because immaterial and irrelevant. But the court overruled the objection, and witness answered: "The deceased received this injury in the Confederate army." Defendant then also moved the court to exclude this evidence because the circumstances under which the injury was received were irrelevant and immaterial; which motion was also refused.

The evidence as to how and when and where the injury was received was in this case most thoroughly irrelevant and immaterial. If the defense had been endeavoring to show that the deceased was violent, turbulent and frequently embroiled in difficulties and strifes, and evidence had been adduced showing he had been disabled by a gun shot, it might have been legitimate, in order to counteract the impression that he had been disabled in such private broils, to make the proof. But such was not the case. In his able brief defendant's counsel says of this evidence: "It is worse than immaterial; it not only fails to illustrate the question upon trial, but it brings foreign matter into the case of such a character as was highly injurious to the rights of appellant. It was calculated to arouse on the side of the State a feeling for 'the hero who so nobly poured out his blood in defense of his country.'" We are of opinion the evidence was inadmissible, and was of a character which could be used, after its admission, in creating a sym pathy for deceased prejudicial to defendant, whether it was so used or not.

For the errors in the admission of inadmissible and prejudicial evidence, the judgment is reversed and the cause remanded.                                    *Reversed and remanded.*